IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CLEARANCE DALLAS, | ) | Case No. 1:20-cv-1720 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Clearance Edward Dallas, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  He challenges the ALJ's negative findings, contending that the administrative law judge ("ALJ") improperly evaluated whether his medical impairments met or medically equaled the medical listings at Step Three of the sequential evaluation process.  He also challenges the ALJ's Step Four evaluation in three ways, arguing: (1) the ALJ failed to apply the proper legal standards in determining Dallas's ultimate residual functional capacity ("RFC") and reached a decision not supported by substantial evidence, and (2) the ALJ failed to apply the proper legal standards in evaluating Dr. Yingling's medical opinion; and (3) the ALJ failed to properly apply the standard for weighing his subjective symptom complaints.  Lastly, he contends that the ALJ failed to apply the proper standards under Step Five by failing to include various limitations asserted by the state agency consultants and in

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

his and the vocational expert's ("VE") testimony. However, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dallas's application for DIB be affirmed.

## I.    Procedural History

Dallas applied for DIB on November 27, 2017. (Tr. 173).[2] Dallas alleged that he became disabled on January 1, 2017, due to a back injury, arthritis, diabetes, depression, spinal stenosis, migraine, herniated discs, nerve damage, hypertension, and blurred vision. (Tr. 72-73). The Social Security Administration ("SSA") denied Dallas's application initially and upon reconsideration. (Tr. 72-87, 90-105). Dallas then requested an administrative hearing. (Tr. 121-122).

ALJ Traci Hixon heard Dallas's case on April 2, 2019 and denied the claim in a June 13, 2019 decision. (Tr. 15-25, 32). In doing so, the ALJ determined that Dallas did not have a medical impairment or combination thereof that met Medical Listings 9.00. 4.00. 1.04. 11.14. or 12.04. (Tr. 18-19). Additionally, the ALJ determined that Dallas had the RFC to perform light work, except that:

> [Dallas] can lift and carry up to 20 pounds occasionally and 10 pounds frequently; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently reach, handle, finger, and feel; and could not perform tasks that involved exposure to unprotected heights, heavy machinery, or commercial driving; could perform simple routine tasks with simple, short instructions; make simple work-related decisions; and required few workplace changes and no fast-pace production requirement.

(Tr. 20). Based on VE testimony that a hypothetical individual of Dallas's age, experience, and RFC could work in available occupations as a produce weigher and laundry bagger, the ALJ determined that Dallas was not disabled. (Tr. 24-25). On June 1, 2020, the Appeals Counsel denied further review, rendering the ALJ's decision the final decision of the Commissioner.

---

[2] The administrative transcript appears in ECF Doc. 14.

(Tr. 1-3).  And on August 5, 2020, Dallas filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Dallas was born on March 3, 1968 and was 48 years old on the alleged onset date. (Tr. 72).  He completed high school and had specialized training in truck driving.  (Tr. 199).  He had prior work experience as a truck driver, but the ALJ determined that he could not perform any past relevant work.  (Tr. 24, 38-42, 199-200).

### B.    Relevant Medical Evidence[3]

#### 1.    Physical Health Evidence

On January 12, 2017, Dallas saw certified nurse practitioner Catherine Holzheimer, CNP, complaining of neck and back pain caused by his tractor trailer accident.  (Tr. 253-254).  He denied any history of back problems.  (Tr. 253.)  A physical examination identified point tenderness on his trapezius muscles and the right side of his back, and some point tenderness along his spine but good flexion.  (Tr. 253-254).

From January 26, 2017 to February 15, 2017, Dallas saw Daniel Hofius, DO, six times, complaining of lower back pain, which shot into his legs, and tightness in his neck. (Tr. 550-554, 559-561, 563, 612, 615).  Initially, Dr. Hofius assessed him with sprains in three regions of his back.  (Tr. 563).  As his visits progressed, he also complained of radiating numbness and peripheral pain in his right leg.  (Tr. 550-554, 559-561, 612, 615).  Dr. Hofius maintained his back sprain diagnosis.  (Tr. 550-552, 612, 616).  During his last visit, Dr. Hofius

---

[3] On January 9, 2017, while driving his tractor trailer, Dallas was involved in a car accident where his trailer was struck from behind by another tractor trailer.  (Tr. 246).

cleared Dallas to return to work with certain limitations, including that he was not to drive. (Tr. 665).

On February 27, 2017, Dallas began physical therapy treatment with chiropractor Jennifer Ross, DO, at Aligned Chiropractic, presenting with constant, sharp, shooting lumbar pain across his sacroiliac joints and extending into his thoracic-lumbar region.  (Tr. 416, 636).  A physical examination showed that he favored his right leg, had a high right shoulder and pelvis, had a protracted orientation to his shoulders, and had spasms, restricted motion, and tenderness across his back.  (Tr. 636-637).  He had normal strength on his right side but reduced strength in his left wrist, and reduced reflexes in both arms.  (Tr. 637).  He reported pain across his back, numbness in his right foot, and intermittent pain in his left wrist.  *Id.*  On a scale of one to ten, with ten being the worst, he reported his pain being at an eight.  *Id.*  He also reported headaches on the right side of his head.  *Id.*  Dr. Ross found that Dallas had sprains across three regions of his back.  (Tr. 638).  A further evaluation of his upper extremities showed that he had a wrist sprain, and that Dallas reported being previously diagnosed with carpal tunnel.  (Tr. 639). Functionally, Dr. Ross found that Dallas had deficits in his ability to sit, stand, drive, lift, reach, work, and sleep.  (Tr. 640).  Dr. Ross recommended physical therapy two times a week for eight weeks.  (Tr. 416).

From March 2, 2017 to March 14, 2017, Dallas was treated at Aligned Chiropractic for his back and neck pain.  (Tr. 400, 403, 406).  Throughout those sessions, Dallas reported spasms, and his response to therapy was described as "good."  (Tr. 400-407).  On March 9, 2017, Dallas had an MRI on his spine.  (Tr. 565).  It showed that his lumbar vertebrae and soft tissue were normal and there was no sign of fracture or pathologic marrow signal.  *Id.*  However, although it also identified that many of his discs were normal, it noted that two were dehydrated and one had

hypertrophic change in the facet joints and moderate foraminal stenosis.  *Id.*  Ultimately, Dallas

was found to have disc disease on those three discs.  (Tr. 566).

On March 15, 2017, Dallas saw Gary Posner, MD, regarding his type-two diabetes.

(Tr. 251).  Dr. Posner assessed that Dallas's diabetes was well controlled by his diet and

instructed him to return in six months.  (Tr. 252).

From March 16, 2017 to April 13, 2017, Dallas continued his therapy at Aligned

Chiropractic.  (Tr. 387, 390, 394, 397, 400).  Initially, he noted that his back pain improved after

treatment, but the relief lasted only a few hours.  (Tr. 400).  At various points, he reported that

his pain caused him difficulty in sleeping and stiffness in his neck and back.  (Tr. 390, 394, 397).

However, he consistently had a "good" response to treatment.  (Tr. 388-389, 392-393, 395-396,

398-399, 401-402).  During this period, Dallas had two x-rays taken of his back.  (Tr. 391, 593,

596).  The first, on April 5, 2017, showed the misalignment of one vertebra, and the second,

taken April 12, 2017, did not show any fracture, subluxation, or spondylolisthesis but did show

mild degenerative changes.  *Id.*

On April 14, 2017, Dallas was seen by Robert McLain, MD, concerning his lower back

pain.  (Tr. 593-594).  Dallas reported that his pain was six out of ten and ten out of ten with

activity.  (Tr. 594).  The pain radiated down both hips and into the back of his thighs.  *Id.*  He

also complained of bilateral knee pain, bilateral leg numbness, and tingling around his calves and

feet.  *Id.*  A physical examination showed that his joints, including his wrists, all had full range of

motion without swelling or pain and his neck, although tender, had a full range of motion.

(Tr. 595).  An examination of his back identified muscular tenderness and spasms.  (Tr. 596).

McLain concurred with the lumbar sprain diagnosis.  *Id.*

From April 18, 2017 to April 27, 2017, Dallas continued his therapy.  (Tr. 381, 384).  He

noted that his leg and back pain were improving, but his back was still tight and sore, and driving

over 20 minutes aggravated his back.  (Tr. 384).  He later included that he had a hard time controlling his pain levels and was observed to be walking more upright.  (Tr. 381).  He continued to have a good response to treatment.  (Tr. 382-383, 385-386).

On May 4, 2017, Dallas saw orthopedist Timothy Nice, MD, for his lower back pain and tingling in his right leg.  (Tr. 525).  A physical examination revealed some guarding of his muscles, but also that Dallas could bend down within six inches of the ground.  *Id.*  He had pain when hyperextended, but his extension was adequate with tenderness at the extremes.  *Id.*  He also had symmetric side bending and rotation.  *Id.*  There were minimal spasms in the paraspinal muscles and tenderness over both sacroiliac joints.  *Id.*  Dr. Nice reviewed the MRI and concluded that Dallas had substantial aggravation of a chronic spondylitis and discogenic issue in his back.  *Id.*  He recommended physical therapy, electrical studies of his legs, and pain and anti-inflammatory medications.  (Tr. 525-526.)

From May 2, 2017 to October 12, 2017, Dallas continued his therapy, initially reporting improvements to his pain, but continued issues with sleeping, right leg pain, stiffness, soreness, sitting, and standing.  (Tr. 349, 352, 355, 359, 362, 367, 370, 373, 375-376, 378).  As his treatment progressed, he noted that moving became easier, and he had an increased ability to sit and stand.  (Tr. 336, 340, 346, 349, 352, 355, 359, 362, 367, 376).  By the end, he also reported that his radiating pain had decreased.  (Tr. 336).  Throughout his treatment, he was noted as having a "good" response to therapy.  (Tr. 338-339, 341-342, 344-345, 347-348, 350-351, 353-354, 356-357, 360-361, 364-365, 368-369, 371-372, 374, 377, 379-380).

On October 9, 2017, Dallas saw Patrick Boylan, MD.  (Tr. 245).  He reported that he continued to have lower back pain, which was more pronounced on his right side than his left.  (Tr. 246).  The pain was also worse when standing or walking and felt better when he was able to sit for short periods.  *Id.*  His neck pain was also more pronounced on his right side than on his

6

left, and he noted some headaches on his right side. *Id.* He further reported occasional paresthesia and having leg pain in his posterior thigh and posterior and lateral calf. *Id.* His back pain was constant, but his leg pain was intermittent. *Id.* He did not report any joint swelling or stiffness, and he moved all his extremities well. *Id.*

During the physical examination, Dallas transitioned solely from sitting to standing and had a slightly antalgic gait. *Id.* Dr. Boylan did not identify any lumbar swelling but noted that Dallas's range of motion was diminished. *Id.* He also noted that Dallas had greater lumbar paraspinal tenderness on his right side than on his left, but there was no pain with hip rotation. *Id.* Dr. Boylan diagnosed a herniated disc and lumbar spondylosis. (Tr. 246-247). In addition to pain medication, he prescribed Dallas one steroid injection for the pain. (Tr. 247).

From October 18, 2017 to February 22, 2018, Dallas's treatment with Aligned Chiropractic continued. (Tr. 324, 326, 329, 332, 419, 421, 887, 890, 894). Initially, he reported a desire to return to work, that he felt like his improvements were regressing, and he continued to have tightness and soreness. (Tr. 324, 326, 329). He once reported pain radiating into this left arm. (Tr. 419). Later, he began reporting that he was not as quickly fatigued and his pain was improving. (Tr. 887, 894). On February 15, 2018, Dr. Ross recommended that his therapy be reduced to once a week. (Tr. 886).

On March 1, 2018 to April 26, 2018, Dallas continued his treatment with Aligned Chiropractic. (Tr. 874, 877, 880, 883). He reported that he did not feel any relief from the injection, still had pain radiating into his right leg and right arm, his back was tightening up, and, later, his headaches returned. (Tr. 877, 880, 883). He was still consistently reported as having a "good" response to therapy. (Tr. 875-876, 878-879, 881-882, 884-885).

On March 29, 2018, Dallas had a follow-up appointment with Dr. Boylan, who assessed Dallas with a herniated disk.  (Tr. 722).  He discussed how Dallas needed another injection in order to best avoid surgical intervention for his back pain.  *Id.*

On May 29, 2018 and June 27, 2018, Dallas returned for treatment at Aligned Chiropractic, complaining that he again had radiating pain in his right leg, his legs were tingling, and his headaches and back pain had returned.  (Tr. 868).

On July 11, 2018, Dallas saw Varinder Dhillion, MD, for a cardiac referral.  (Tr. 744).  He reported feeling heart palpitations and was assessed with shortness of breath and palpitations.  (Tr. 744-745).  Dr. Dhillion provided medication for the shortness of breath, advised him to reduce his caffeine consumption, and instructed him to walk more.  (Tr. 745).

On August 10, 2018 and September 25, 2018, Dallas had therapy appointments, where he reported the same pain and numbness in his back and right leg and radiating numbness in his right arm.  (Tr. 869).  On October 15, 2018, Dallas had a selective nerve root block on his back.  (Tr. 839).  No complications were indicated.  *Id.*  He then returned to Aligned Chiropractic on November 20 and 27, 2017, and reported weakness in his right leg and numbness and pain in his back.  (Tr. 865).  On December 4, 2018, Aligned Chiropractic recommended that he complete his treatment through vocational rehabilitation.  (Tr. 863).

On December 19, 2018, Dallas returned to Dr. Boylan.  (Tr. 714).  A physical examination showed that he had a decreased cervical range of motion particularly with extension, which also increased his neck pain.  (Tr. 715).  Dallas also had cervical paraspinal tenderness bilaterally; and Dr. Boylan noted that his upper limb reflexes were symmetrical, he had full strength with manual muscle testing, but he did have diminished sensation with two fingers on his right hand.  *Id.*  Dr. Boylan maintained his herniated disk and spondylosis diagnoses and added a neck sprain diagnosis.  (Tr. 716).  During his examination, Dr. Boylan

8

also conducted an electromyography exam on Dallas's upper extremities.  (Tr. 730).  His
impression was that Dallas's extremities were normal, but Dallas had bilateral moderate to
severe median neuropathy in his wrist and there was no evidence of a cervical radiculopathy or a
peripheral polyneuropathy.  *Id.*

### 2.    Mental Health Evidence

On December 12, 2017, psychologist, Patrick Yingling, PsyD, evaluated Dallas's mental
health.  (Tr. 434).  He diagnosed Dallas with a major depressive disorder based on two
diagnostic tests.  (Tr. 439).  He found that there was no objective evidence of clinical depression
prior to Dallas's 2017 injury, and it was currently of mild severity.  (Tr. 440).  Additionally,
Dr. Yingling indicated that Dallas had temporary physical or health restrictions related to his
conditions and could not return to the full duties of his previously held job.  (Tr. 691).  He stated
that Dallas's psychological symptoms, which served as a barrier to his return to work, included
depressed mood, low energy level, lack of motivation, and feeling overwhelmed.  *Id.*  He noted
that Dallas's symptoms made him a poor candidate for vocational rehabilitation.  (Tr. 692).
Overall, he assessed Dallas with a single-episode, mild, major depressive disorder.  *Id.*

From March 28, 2018 to June 13, 2018, Dallas was seen by a licensed independent social
worker supervisor, Joseph Cavallaro, LISW-S.  (Tr. 695-696, 795-804).  During their sessions,
Cavallaro noted that Dallas displayed symptoms of anxiety and/or depression.  (Tr. 695, 795,
797, 799, 801, 803, 805, 807, 809, 811, 813).  Cavallo indicated that Dallas's depression was
attributable to his pain and medical circumstances, furthered by his lack of sleep, fatigue, and
frustration causing him to feel overwhelmed.  (Tr. 696, 796, 798, 800, 802, 804).  During each
visit, Cavallo also assessed Dallas's functional abilities, generally identifying that Dallas had
mild/moderate limitations in his social functioning; moderate/marked limitations in his daily

activities; and moderate limitation in his concentration, persistence, and pace; and adaptation. (Tr. 696, 796, 798, 800, 802, 804).

On July 17, 2018, Dr. Yingling again saw Dallas for treatment. (Tr. 805). He noted that Dallas was exhibiting symptoms of depression and that Dallas continued to have difficulty sleeping, engaging in recreational activities, staying physically active, focusing, and managing unexpected stressors due to his pain. (Tr. 805-806). In his functional assessment, Dr. Yingling found that Dallas had moderate limitations in every category except social functioning where he had mild/moderate limitations. (Tr. 806).

From July 25, 2018 to September 5, 2018, Dallas continued being treated with Cavallaro. (Tr. 807-814). In addition to noting Dallas's issues managing his pain, sleep, fatigue, and frustration, Cavallaro noted that Dallas's pain and frustration caused social isolation. (Tr. 808, 810, 812, 814). Cavallaro's functional assessments remained the same. (Tr. 808, 810, 812, 814).

On September 25, 2018, Dallas saw Dr. Yingling and exhibited signs of depression. (Tr. 815). Dr. Yingling gave a poor prognosis and found that Dallas had moderate limitations in functioning across almost every category but found mild/moderate limitations in his social functioning. (Tr. 815-816). Dr. Yingling opined that Dallas continued to experience persistent pain, which created sleep difficulties, as well as irritability and low frustration tolerance. (Tr. 816). He reported that Dallas could manage most self-care independently and had some limited sources of social support. *Id.* He reported that Dallas tended to snap and be angry with his wife, to react emotionally, and had difficulty with managing stress. *Id.*

From October 3, 2018 to December 12, 2018, Dallas continued meeting with Cavallaro. (Tr. 817-828). Cavallaro's assessment of Dallas's symptoms and functional limitations remained largely the same. *See id.* He indicated that Dallas continued to view his pain as having a negative impact on his life and daily activities, he was frustrated, and these circumstances

10

created feelings of helplessness. (Tr. 818, 820, 822, 824, 826, 828). His functional assessment grew progressively worse, with his final assessment indicating that Dallas had marked limitation in his social functioning and concentration, persistence, and pace; moderate/marked limitations in his daily activities; and moderate limitations in his adaptation. (Tr. 828).

On December 18, 2018, Dr. Yingling found that Dallas exhibited signs of depression, and he had many of the same observations of Dallas's complaints as before. (Tr. 829-830). However, he found that Dallas only had moderate limitations in functioning in every category except social functioning, in which Dallas had only mild/moderate limitations. (Tr. 830).

### C. Relevant Opinion Evidence

#### 1. Consultive Examiner – Freeland Ackley, MD

On May 12, 2018, Dallas was seen by consultive examiner Freeland Ackley, MD, regarding his back pain. (Tr. 703). He observed that Dallas could undress and dress himself without difficulty, lift, carry, and handle light objects and walked in and out of the exam room "with no difficulty," but he did not cooperate in sitting on the exam table, touching his toes, or squatting. (Tr. 706-707). Dr. Ackley's examination did not assess Dallas with any tenderness of his spine or evidence of muscular asymmetry, atrophy, or any acute joint findings. (Tr. 707). Based on Dallas's lack of cooperation, Dr. Ackley was not able to gauge Dallas's ability to walk, sit, or stand. *Id.* But he found that Dallas did not have any substantial physical limitations and his medical conditions seemed well controlled on current medication, as there were no acute symptoms that suggested otherwise. *Id.*

#### 2. Consultive Examiner - Julie Janco-Gidley, PhD

On February 5, 2018, Dallas was evaluated by psychologist Julie Janco-Gidley, PhD. (Tr. 674). After evaluating his medical history and mental health, she found that, although some slight struggles existed, Dallas could follow simple instructions, interact with others, and handle

work stress but may need more time than peers for some tasks.  (Tr. 678-679).  Dallas reported

that he likewise felt he could understand, remember, and carry out simple instructions.  (Tr. 679).

Dallas also reported that he would persist when faced with a difficult task, had "great"

relationships with supervisors and coworkers, and handled stress and pressure "fairly good."  *Id.*

Dr. Janco-Gidley concluded that his symptoms were consistent with single-episode, moderate,

major depressive disorder.  *Id*.

### 3. State Agency Consultants

On January 1, 2018, William Bolz, MD, evaluated Dallas's physical health based on the

medical evidence.  (Tr. 88).  As relevant here, he found that Dallas was limited to standing,

walking, or sitting for six hours in an eight-hour workday and did not have any manipulative

limitations.  (Tr. 82-83).  On reconsideration, Elaine Lewis, MD, concurred with Dr. Bolz's

assessment.  (Tr. 99-100).

On February 2, 2018, psychologist Kathleen Malloy, PhD, evaluated Dallas's mental

health based on the medical evidence.  (Tr. 80).  She found that Dallas had mild limitations in his

interaction with others and moderate limitations in his ability to understand, remember, and

apply information; concentration, persistence, or maintaining pace; and adaptation or managing

himself.  *Id.*  Specifically, regarding his ability to work a normal workday without interruptions

from psychologically based symptoms, Dr. Malloy opined that Dallas could perform tasks in

settings with flexible pace and production requirements.  (Tr. 85).

On April 17, 2018, upon reconsideration, psychologist Karen Terry, PhD, agreed with

Dr. Malloy's limitations.  (Tr. 97, 101-102).  She added, however, that Dallas would benefit from

having detailed instructions repeated as needed.  (Tr. 102).

### D.        Relevant Testimonial Evidence

Dallas testified at the hearing.  (Tr. 33-61).  He lived at home with his wife.  (Tr. 34).  He did not prepare meals, wash dishes, do laundry, do any chores, or go shopping.  (Tr. 35).  He had difficulty personally caring for himself because of the pain moving to dress caused.  (Tr. 35-36).  He did not have any hobbies or interests since his accident, but he fed and watered his dog.  (Tr. 36).  His grandchildren walked the dog for him, however.  *Id.*  His typical day was him getting up, watching television, tending to the dog, and taking naps.  (Tr. 37).  He typically took naps every day for several hours.  *Id.*  He would talk to his family on the telephone.  *Id.*  He did not run errands throughout the day; usually he only left for appointments.  (Tr. 38).  If he needed anything his stepchildren would run the errand for him.  *Id.*  Dallas had previously worked in various jobs as a flatbed truck driver or dump truck driver.  (Tr. 38-42).

Dallas stated that he was disabled because he was limited in everything he could do.  (Tr. 42).  He could not walk far or sit very long and was overwhelmed.  *Id.*  He had spasms and pain running through his lower back into his buttocks and legs, as well as pain in his neck and down his arms.  (Tr. 43).  The pain started after his car accident.  *Id.*  He explained that he had had a nerve block procedure, but that did not provide significant, long-term relief and that he also had arthritis and type-two diabetes.  (Tr. 43-44).  He was also on blood pressure medication and was in counseling.  (Tr. 45).

Dallas stated that it was hard to get up from his knees and he could currently lift or carry only about 5 to 10 pounds, stand for about 30 minutes, sit for about 30 minutes, had trouble holding items, and could not use stairs.  (Tr. 47-50).  He could not reach for objects over his head without getting intense pain in his neck.  (Tr. 50-51).  He also had trouble remembering things, could not concentrate on television, and had trouble interacting with people.  (Tr. 51-52).  He walked with a walking stick every day, both inside and outside the house.  (Tr. 53).  He also used

a back brace.  (Tr. 54).  Neither the walking stick nor the back brace were prescribed by his

doctors.  (Tr. 52-53, 54).  The ALJ also asked whether he would be able to do a job where he

could sit for part of the day and "maybe walk a little bit," to which Dallas replied that he did not

know where he would find that job or if he could do it.  (Tr. 61).

A VE and certified rehabilitation counselor, Michael Klein, also testified.  (Tr. 62).  He

found that Dallas had a history of heavy truck driving and dump truck driving.  *Id.*  The ALJ

asked him the following hypothetical:

> [A]ssume a hypothetical person of the same age, education, and employment
> background as Mr. Dallas.  If this person could lift or carry 20 pounds
> occasionally, 10 pounds frequently; stand and walk for six hours, sit for six hours;
> occasionally climb stairs and ramps, but no ladders, ropes, or scaffolding;
> occasionally balance, stoop, kneel, crouch, and crawl; this person could frequently
> reach in all directions and frequently handle, finger, and feel; but would not be
> exposed to unprotected heights, heavy, dangerous machinery, or commercial
> driving.  This person is performing simple, routine tasks with simple, short
> instructions; making simple decisions with few workplace changes; there should
> be no fast-paced production quota requirements.  Would that hypothetical person
> be able to perform Mr. Dallas's past work?

(Tr. 63).  The VE opined that the individual would not and that such a person would be limited to

a restricted light profile.  *Id.*  Consistent with those limitations, however, such a person would be

able to work as a produce weigher or a laundry bagger.  (Tr. 64).  He opined that an individual

who could only occasionally lift or carry ten pounds, frequently lift or carry five pounds, and

who could only stand and walk for two hours in an eight-hour day and sit for six hours, would

also be able to work in the national economy.  *Id.*  Further, in response to the ALJ, he opined that

absences or tardiness more than one day a month would generally preclude any competitive

employment.  (Tr. 65).  Lastly, he opined, in response to a question from Dallas's counsel, that if

the individual from the original hypothetical was only able to handle, finger, and feel 50 percent

of the time bilaterally, then whether than individual could perform sedentary work would depend

on the occupation.  (Tr. 69).

III.    **Law & Analysis**

A.    **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

is not necessary that this court agree with the Commissioner's findings," so long as it meets this

low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-

guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the

court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d

875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996));

*accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1,

2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or

merely overlooked.").

**B.      Step Three: Listings 1.04, 4.00, 11.14, and 12.04**

Initially, Dallas argues that the ALJ failed to adequately consider the combination of his

impairments in determining that he did not medically equal the severity of Listings 4.00, 1.04,

and 11.14.  ECF Doc. 16 at 12-13.  Further, specifically about Listing 12.04, he argues that the

ALJ's decision was not supported by substantial evidence as his ability to occasionally perform

activities under the paragraph B criteria did not mean his symptoms were not disabling.  ECF

Doc. 16 at 13-15.  The Commissioner disagrees.  ECF Doc. 18 at 6-13.  Dallas reiterates his

arguments in reply.  ECF Doc. 19 at 1-3.

**1.      Step Three Standard**

At Step Three of the sequential evaluation process, a claimant has the burden to show that

he has an impairment or combination of impairments that meets or medically equals the criteria

of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d

348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria

of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R.

§ 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of

SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the

listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must

"actually evaluate the evidence, compare it to [the relevant listed impairment], and give an

explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of*

*Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). Further, "[a]n ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings." *Loy v. Sec'y of Health & Human Serv.*, 901 F.2d 1306, 1310 (6th Cir. 1990) (quoting *Gooch v. Sec'y of Health & Human Serv.*, 833 F.2d 589, 592 (6th Cir. 1987)).

In evaluating the medical listings, an ALJ need not directly address every piece of evidence submitted by a party. *Kornecky v. Commissioner*, 167 F. App'x. 496, 508 (6th Cir. 2006). Although the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Listing 12.04 provides requirements for depressive, bipolar, and related disorders. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04. A claimant must satisfy either the criteria in both paragraphs A and B, or just in paragraph C of Listing 12.04. *Id.* As relevant here, the claimant must show that he meets the criteria of paragraph B by showing one extreme limitation or two marked limitation in the following areas of the mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04.

### 2. Listing 1.04, 4.00, and 11.04 Analysis

The ALJ applied the proper legal standards in concluding that Dallas did not present limitations that, singly or in combination, met or medically equaled Listings 1.04, 4.00, and

11.14.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Although Dallas contends that the ALJ's

discussion was insufficient, the ALJ's passing reference to "combination of impairments,"

followed by her analysis of individual impairments does not mean the ALJ's Step Three analysis

was inadequate.  *Loy*, 901 F.2d at 1310; ECF Doc. 16 at 12-13.  Here, the ALJ first

acknowledged her obligation to consider the combination of impairments and then properly

evaluated, compared, and explained her finding for each relevant impairment.  *Reynolds*, 424 F.

App'x at 416; (Tr. 18-19).  Specifically, the ALJ: (1) identified the applicable medical listings or

those most analogous to Dallas's impairments; (2) noted the lack of medical evidence that

Dallas's impairments met any of the listings' requirements; and (3) explained that because the

evidence did not support any of the listings' requirements, she found that Dallas's impairment

did not meet or medically equal the listings.  (Tr. 18).  Because the ALJ applied the proper legal

standards in evaluating the impairments for Listing 1.04, 4.00, and 11.04, because she found

Dallas met none of them, and because the ALJ confirmed that she also considered them in

combination, the ALJ's explanation was sufficient.  Further, the ALJ's determination regarding

the lack of a listings finding fell within the Commissioner's "zone of choice," which this court

cannot disturb.  *Mullen*, 800 F.2d at 545.

### 3. Listing 12.04 Analysis

Substantial evidence supports the ALJ's conclusion that Dallas's impairments, singly or

in combination, did not meet or medically equal Listing 12.04.  42 U.S.C. § 405(g); *Rogers*, 486

F.3d at 241.  Dallas's assertion that his ability to *occasionally* perform the paragraph B criteria,

based on Cavallo and Dr. Yingling's treatment notes, ultimately fails.  ECF Doc. 16 at 13-15.

Substantial evidence supports the ALJ's conclusion that the objective medical evidence, Dallas's

own statements, and his treatment history were inconsistent with his subjective symptom

complaints.  (Tr. 20-22).  Specifically, such evidence includes: (1) Dr. Janco-Gidley's notes that,

although Dallas had "slight struggles," he was able to understand and follow simple directions, which was consistent with Dallas's self-assessment of his abilities (Tr. 678-679); (2) treatment notes indicating that Dallas had only moderate limitations in social interacting, and Dallas's own statements that he spoke on the phone with family and spent time with his wife, stepchildren, and grandchildren (Tr. 34, 36, 38, 696, 796, 798, 800, 802, 804, 806, 808, 810, 812, 814, 816, 818, 820, 822, 824, 826, 828, 830); (3) Dallas's statements that he was persistent and treatment notes indicating that, generally, he had only moderate limitations in concentration, persistence, and pace (Tr. 679, 696, 806, 808, 810, 812, 814, 816, 830); and (4) Dallas's statements that he was "fairly good" at tolerating stress and his limited daily activities were due to his physical symptoms; treatment notes, generally, assessing him with moderate limitations in his adaptation; and his observed ability to maintain consistent therapy appointments (Tr. 35-36, 679, 696, 796, 798, 800, 802, 804, 806, 808, 810, 812, 814, 816, 830). *Biestek*, 139 S. Ct. at 1154.

Although it is concerning that the ALJ repeatedly noted and relied on Dallas's work experiences prior to his accident in determining whether he met the paragraph B requirements, Dallas has not challenged the legitimacy of these reasons, but only asserts that substantial evidence does not support the ALJ's conclusion.  ECF Doc. 16 at 13-15.  Because the ALJ's findings as to Listing 12.04 were supported by substantial evidence, her resulting determination falls within the Commissioner's "zone of choice," which this court cannot disturb.  *Mullen*, 800 F.2d at 545.

C.    **Step 4: Ultimate RFC Determination**

Dallas argues that the ALJ failed to adequately evaluate his obesity and diabetes pursuant to SSR 14-2p and SSR 19-2p.  ECF Doc. 16 at 11-12.  Specifically, he asserts that the ALJ's "brief and conclusory statement" – that she considered the effects of his obesity and diabetes – was not enough to "satisfy the ALJ's burden to support her RFC with substantial evidence."

ECF Doc. 16 at 12.  Dallas asserts that a proper consideration of these limitations should have resulted in a finding that he was limited to sedentary work.  ECF Doc. 16 at 12.  Dallas also asserts that substantial evidence did not support the RFC because he should have had greater limitations due to the neuropathy in his wrist.  ECF Doc. 16 at 13.  The Commissioner disagrees.  ECF Doc. 18 at 13-17.  Dallas reiterates his argument in reply.  ECF Doc. 19 at 3-4.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Neither obesity nor diabetes mellitus is a listed impairment for adults.  SSR 02-1p, 2002 SSR LEXIS 1 at *12-15 (Sept. 12, 2002)[4]; SSR 14-2p, 2014 SSR LEXIS 3 at *15-16 (June 2, 2014).  Nevertheless, the effects of diabetes mellitus and obesity, alone or in combination with other impairments, may meet or medically equal the criteria of a listing.  SSR 02-1p, 2002 SSR LEXIS 1 at *12-15; SSR 14-2p, 2014 SSR LEXIS 3 at *15-16.

---

[4] On May 20, 2019, SSA published SSR 19-2p, which rescinded and replaced the guidelines for evaluating a claimant's obesity under SSR 02-1p.  SSR 19-2p (May 20, 2019).  Because SSA stated that SSR 19-2p applies only to applications filed on or after May 20, 2019, SSR 19-2p lacks retroactive effect, and SSR 02-1p applies to Dallas's claims.  *See* SSR 19-2p; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law . . . and administrative rules will not be construed to have retroactive effect unless their language requires this result.").

The ALJ applied the proper legal standards and substantial evidence supported her determination that: (i) Dallas's obesity and diabetes mellitus did not warrant a limitation to sedentary work, and (ii) Dallas's wrist injury did not justify greater limitations. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Here, the ALJ sufficiently discussed and considered Dallas's obesity, diabetes mellitus, and wrist limitations in analyzing Dallas's RFC. SSR 96-8p; 20 C.F.R. § 404.1529(a). As discussed above in Section III.B.2, the ALJ recognized her obligation to consider the combination of impairments; in doing so, the ALJ specifically referenced the regulations for obesity and diabetes mellitus. (Tr. 18). Additionally, the ALJ's consideration is evident from looking at the decision as a whole. *Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79. In discussing Dallas's RFC, the ALJ considered the possible limitations from his diabetes, noting treatment records that indicated Dallas's diabetes was well managed and there was no evidence of peripheral neuropathy. (Tr. 21). Likewise, the ALJ considered Dallas's possible wrist limitations in her discussion of his upper extremity complaints. (Tr. 21). Lastly, the ALJ considered Dallas's obesity, as she identified it as a severe impairment, noting that it was mild and there was no indication it resulted in symptoms or functional limitations. (Tr. 18).

Substantial evidence also supports the ALJ's determination that Dallas's obesity, diabetes mellitus, or his wrist pain warranted greater limitations. As to his obesity and diabetes, such evidence includes: (1) Dr. Ackley's treatment notes that indicated that Dallas did not appear to have troubling moving, while noting his height and weight (Tr. 703, 707); (2) Dr. Parsons's treatment notes indicated that Dallas's diabetes was well controlled (Tr. 251); and (3) the lack of evidence of any hospitalization, emergency intervention, or worsening diagnoses. *Biestek*, 139 S. Ct. at 1154. Further, as to the neuropathy in his wrist, such evidence includes: (1) the focus of Dallas's therapy on his back, neck, and legs (Tr. 324, 326, 329, 333, 352, 355, 359, 362, 367, 370, 373, 375-376, 378, 381, 384, 387, 390, 397, 400, 407, 419, 421, 877, 880, 883, 887, 894);

(2) Dallas's reported prior carpal tunnel diagnosis (Tr. 639); and (3) Dallas's only sporadic complaints regarding pain in his "upper extremities" – never specifying his wrist (Tr. 419, 869, 887). *Biestek*, 139 S. Ct. at 1154. As such, the ALJ had sufficient relevant evidence that a reasonable mind might accept as adequate to support her determination that Dallas was limited consistent with the specific findings in her RFC. *Id.* And, the ALJ's RFC determination in this respect must be affirmed.

### D.    Step 4: Weighing Opinion Evidence

Dallas argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in determining that Dr. Yingling's opinions were unpersuasive. ECF Doc. 16 at 16-17. Specifically, Dallas asserts that the ALJ "failed to provide a coherent explanation for discounting these opinions" and, therefore, failed to build an accurate and logical bridge between the evidence and the result. ECF Doc. 16 at 17. The Commissioner disagrees. ECF Doc. 18 at 17-20. Dallas reiterates his argument in reply. ECF Doc. 19 at 3.

In determining a claimant's RFC, the ALJ must also evaluate opinion evidence. *See* 20 C.F.R. § 404.1520(e). In doing so, the ALJ may not "defer or give any specific evidentiary weight" to any medical opinion and is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5). Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the

relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied the proper legal standards supported by substantial evidence in discounting Dr. Yingling's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Somewhat disturbing was the ALJ's careless use of the word "consistency."  The ALJ used the word "consistency" to consider how well Dr. Yingling's opinions were supported by his own findings even though the regulation describes that as a "supportability" analysis.  Nevertheless, in looking at what the ALJ actually *did*, I find that the ALJ properly considered both the consistency and the supportability of Dr. Yingling's opinion in discounting it.  20 C.F.R. § 404.1520c(b)(2), (c)(2).  The ALJ identified discrepancies between Dr. Yingling's opinion and (1) his own treatment notes; and (2) his own initial evaluation of Dallas's condition (these were her "supportability" findings); and (3) Dr. Janco-Gidley's opinion (this was her "consistency" finding). (Tr. 23).  Further, the ALJ discussed the supportability and consistency of Dr. Yingling's opinion when the decision is looked at as a whole.  *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  In evaluating Dallas's RFC, the ALJ noted a lack of specific neuropsychological evaluations in the records from Dr. Yingling's practice group.  (Tr. 22).  Common sense dictates that the ALJ's statement applies to Dr. Yingling's opinion.  *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  Because the ALJ discussed both the lack of consistency and supportability in discounting Dr. Yingling's opinion, she applied the proper regulations and built a logic bridge to explain her decision, sufficient to provide for us to make a meaningful review.  *Fleischer*, 774 F. Supp. 2d at 877.

Moreover, substantial evidence supports the ALJ's conclusion to discount Dr. Yingling's opinion.  Dr. Yingling's opinion was in conflict with the other medical evidence, such as (1) Dr. Janco-Gidley's conclusion that Dallas had only "slight struggles" in his functioning

(Tr. 678-679); and (2) his own evaluations, which consistently noted that Dallas's depression resulted in only moderate limitations (Tr. 692, 806, 815-816, 830).  *Biestek*, 139 S. Ct. at 1154. Even assuming Dr. Yingling's opinion was supported by a preponderance of evidence, it would be an insufficient basis to remand the ALJ's opinion.  The presence of contrary evidence does not overcome the substantial evidence supporting the ALJ's determination.  *O'Brien*, 819 F. App'x at 416.  Accordingly, Dallas's argument fails and provides no basis for remand.

### E.    Step 4: Subjective Symptom Complaint Evaluation

Dallas argues that the ALJ failed to "make a defensible determination as to whether [his] testimony was credible."  ECF Doc. 16 at 19.  Specifically, Dallas contends that the ALJ failed to sufficiently explain why his pain complaints were not credible in a manner that would be clear to a subsequent reviewer.  ECF Doc. 16 at 20.  Dallas also asserts that evidence in the record did not support a finding that his testimony was not credible, but instead supported his complaint that his pain caused decreased concentration.  ECF Doc. 16 at 19-20.  The Commissioner disagrees.[5] ECF Doc. 18 at 21-24.  Dallas did not address this issue in his reply brief.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. § 404.1520(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*,

---

[5] The Commissioner construes Dallas as also arguing that the ALJ failed to properly evaluate Cavallaro's opinion.  ECF Doc. 18 at 20.  However, Dallas makes only as passing comment about the absence of Cavallaro's assessments in the ALJ's decision and, thus, has waived the argument.  *See Hicks v. Comm's of Soc. Sec.*, 909 F.3d 786, 806 n.8 (6th Cir. 2018) (holding that an argument was properly preserved because it was not raised in a "perfunctory manner" (internal quotation marks omitted)); ECF Doc. 16 at 15-17.

35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. § 404.1529(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

While previously characterized as a "credibility" finding, in SSR 16-3p, the Social Security Administration acknowledged that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. SSR 16-3p, 2016 SSR LEXIS 4 (Oct. 25, 2017).  SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in finding that Dallas's subjective symptom complaints were inconsistent with the medical evidence.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Here, the ALJ noted the regulation's factors and addressed specific portions of Dallas's subjective complaints, identifying for each whether she found it consistent or not.  (Tr. 20-22)  Specifically, the ALJ: (1) acknowledged Dallas's complaints of: significant difficulty with his upper extremities, chronic back pain, debilitating symptoms from his diabetes mellitus and hypertension, and disability mental symptoms; (2) noted evidence, or the lack thereof, that supported or weakened the condition's limiting qualities; and (3) explained what she determined the evidence demonstrated.  *Felisky*, 35 F.3d at 1036; (Tr. 21-22).

Substantial evidence also supports the ALJ's conclusion that Dallas's subjective complaints were inconsistent with other evidence in the record. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  With regard to his upper extremities, as discussed above in Section III.C, substantial evidence supported the ALJ's assessment of Dallas's functioning, such as the focus of Dallas's therapy, his prior carpal tunnel diagnosis, the electromyograph results, and the lack of other diagnosis from consulting and pain management doctors.  *See* (Tr. 324, 381, 407, 419, 639, 369, 887).  As to his chronic pain, such evidence included: (1) his record of conservative treatment through therapy and lack of surgical procedures (Tr. 245-247, 525-526, 593-596, 714-716, 722); (2) Dallas's statements of improvement with consistent therapy (Tr. 349, 352, 355, 359, 362, 367, 373, 376, 384, 894); and (3) Dr. Boylan's finding that he moved his extremities well.  (Tr. 246).  Dallas's subjective symptom complaints concerning his diabetes and hypertension were likewise inconsistent with the record evidence indicating his diabetes mellitus and hypertension did not worsen after his accident and were well-managed. (Tr. 251-252, 744-745).  And, as described above in Section III.B.3, substantial evidence

supported the ALJ's finding that Dallas's mental health concerns were not disabling, as
Dr. Janco-Gidley found him to have only "slight struggles" and Dr. Yingling's office notes
consistently found moderate limitations.  *Biestek*, 139 S. Ct. at 1154; (Tr. 678-679, 806, 816,
830).

Because the ALJ applied the proper legal standards and reached a decision supported by
substantial evidence, the ALJ's findings regarding of Dallas's subjective symptom complaints
about his physical and mental impairments fell within the Commissioner's "zone of choice" and
cannot be disturbed by this court.  *Mullen*, 800 F.2d at 545

### F.    Step 5: Limitations Not Included in Hypothetical

Dallas argues that the ALJ's Step Five finding that he was not disabled was not supported
by substantial evidence when the ALJ failed to include in the RFC the state agency consultants'
limitation that he "needed instructions repeated" and "a flexible pace."  ECF Doc. 16 at 21-22.
Dallas also appears to assert that the finding that he could perform work in the national economy
was inconsistent with the VE's testimony that a 50% use of upper extremities limitation *might* be
work-preclusive and that he could not work if he needed to leave early, come in late, or not show
up three times a month.  ECF Doc. 16 at 21.  Further, Dallas argues that he should have been
limited to sedentary exertion because the ALJ *asked* Dallas if he could perform a job where he
"sat for part of the day and maybe walked a little bit."  ECF Doc. 16 at 22.  The Commissioner
disagrees.  ECF Doc. 18 at 18-19.  Dallas does not address this issue in his reply brief.

At the final step of the sequential evaluation process, the burden shifts to the
Commissioner to produce evidence as to whether the claimant can perform a significant number
of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir.
2002).  An ALJ may determine that a claimant has the ability to adjust to other work in the
national economy by relying on a VE's testimony that the claimant has the ability to perform

specific jobs.  *Id.*  A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations that [she] finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ applied the proper legal standards in deciding to exclude the limitations urged by Dallas in her hypothetical to the VE.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Dallas's asserted limitations – drawn from the state agency consultants' opinions and the VE's testimony – ultimately fail because they seek to reargue what he previously raised regarding the medical listings, subjective symptom complaints, and the ALJ's ultimate RFC determination.  First, the state agency consultant's limitation for repeated instructions was specifically for *detailed* instructions, which the ALJ accounted for when she found Dallas was limited to simple instructions.  (Tr. 63, 84-85).  As to the remaining limitations, the ALJ found them not established by the record and, as discussed above, her determinations were supported by substantial evidence.  As such, the ALJ did not need to incorporate them into her hypothetical to the VE.  *Lee*, 529 F. App'x at 715.  And, Dallas has not raised a direct challenge to the ALJ's

limitations on his ability to sit, stand, or walk or his absences from work.[6] As such, the ALJ applied the proper legal standards in articulating the hypothetical to the VE, and her decision must be affirmed.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Dallas's application for DIB be affirmed.

Dated: October 26, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).

---

[6] To the extent Dallas intends his argument to be to the ALJ's Step Four RFC determination, Dallas's arguments fails as he did not point to any medical evidence indicating that the contested limitations should have been included in his RFC. *See Walter v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).